Filed 12/23/13  Ragan v. City of Inglewood CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRIAN RAGAN, | B239094 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC440679) |
| v. | |
| CITY OF INGLEWOOD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kevin C. Brazile, Judge.  Affirmed.

Law Offices of Gregory W. Smith, Gregory W. Smith; Benedon & Serlin, Douglas G. Benedon and Kelly R. Horwitz for Plaintiff and Appellant.

Bergman Dacey Goldsmith, Gregory M. Bergman, Michele M. Goldsmith and Mark W. Waterman for Defendant and Respondent.

───────────────

Appellant Brian Ragan, a Caucasian police officer with the City of Inglewood Police Department (IPD), brought a reverse discrimination lawsuit against his former employer. Ragan worked for the IPD from 2002 through 2010. In a two-month period in 2008, Ragan was involved in three use-of-force incidents, resulting in two fatal shootings of African-American males, and a beating of an Hispanic male captured on video by television cameras. Following investigations into these incidents, Ragan was assigned to an administrative position as his psychological evaluation indicated he was temporarily not fit for patrol duties. Ragan was terminated when, in the course of his administrative assignment, he copied confidential documents related to an internal affairs investigation concerning his involvement in another use-of-force incident. Ragan sued the City of Inglewood (the City), alleging causes of action for racial discrimination and retaliation under California's Fair Employment Housing Act (FEHA), Government Code section 12900 et seq.[1] The City successfully moved for summary judgment, and Ragan appeals from the ensuing judgment. We affirm, concluding Ragan has not raised a triable issue of fact that the decisions affecting his employment were motivated by a discriminatory animus toward Caucasian police officers, or that a causal link exists between any protected activity and an adverse employment action to establish a prima facie case of retaliation.

UNDISPUTED MATERIAL FACTS[2]

1. *Ragan's Employment*

Ragan began working for the IPD in October 2002. His father also worked for the IPD until 2005.

Ragan was terminated in August 2010. Chief of Police Jacqueline Seabrooks, an African-American female, made the decision to terminate Ragan. Ragan's lawsuit is

---

[1]     Unless indicated, all further statutory references are to the Government Code.

[2]     We take the facts from the record that was before the trial court when it ruled upon the summary judgment motion. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034-1035.)

solely based upon Seabrooks's allegedly discriminatory animus toward Caucasians that affected her decisions to place him on paid administrative leave, to assign him to an administrative position, and to terminate him.

### 2. *Use-of-Force Incidents Involving Ragan*

The City tracks external and internal complaints against its officers. Internal affairs investigates the complaints, which are documented in an officer's internal affairs history sheet. Ragan had approximately 30 internal affairs files opened while employed with the IPD. In addition to the three use-of-force incidents in 2008, one other incident is at issue here.

### a. *Carranza Incident (2006)*

In 2006, Ragan was involved in a use-of-force incident during the arrest of Eduardo Carranza. After an internal affairs investigation, Ragan received a 17-day suspension. Ragan appealed the suspension. The appeal was pending when Ragan returned to work after the investigations into the 2008 incidents. While in his administrative assignment, Ragan copied confidential documents related to the Carranza incident and gave the documents to his attorney.

### b. *Three Use-of-Force Incidents in 2008*

In a two-month period in 2008, Ragan was involved in three use-of-force incidents involving minority citizens. Two of these incidents resulted in the fatal shooting of African-American males.

### (1). *Fatal Shooting of Michael Byoune*

On May 11, 2008, Ragan shot and killed Michael Byoune, an African-American male. Pursuant to the IPD policy, Ragan was evaluated by a psychologist. The psychologist determined that Ragan "appears to be fit to continue full duty at this time." According to Ragan, he returned to work about two weeks after his psychological evaluation. An internal affairs investigation ensued.

3

(2). *Rene Melendez Incident*

On July 12, 2008, Ragan was involved in an altercation with Rene Melendez, an Hispanic male. The Melendez incident was captured on video and broadcast on Univision television. An internal affairs investigation into the incident ensued.

(3). *Fatal Shooting of Kevin Wicks*

On July 21, 2008, nine days after the Melendez incident, Ragan shot and killed Kevin Wicks, an African-American male. Following the shooting, Ragan met twice with the psychologist. Unlike the Byoune shooting, the psychologist did not state that Ragan was fit to "continue full duty at this time." The letter stated: "Officer Ragan was open in discussing the incident and his feelings related to the incident. He appeared to be functioning well and he did not report any psychological symptoms that would affect his performance."

3. *Ragan's Paid Administrative Leave after Third Use-of-Force Incident*

Chief Seabrooks placed Ragan on paid administrative leave after the Wicks shooting. While on paid administrative leave, Ragan received his salary and benefits, and he was otherwise eligible to take exams and to be placed on promotion lists.

Ragan was on paid administrative leave until April 2009, while internal affairs completed its investigations into the 2008 incidents. Ragan's attorney sent letters to Chief Seabrooks complaining about the length of Ragan's paid administrative leave.

Chief Seabrooks stated that once the facts of the Melendez incident became clear through the internal affairs investigation, she decided that Ragan needed to undergo a fitness-for-duty evaluation. In early May 2009, Ragan underwent the examination. Ragan's examination revealed that he was fit to return to light or administrative duties, but not to patrol or field duties.

4. *Results of Investigations into 2008 Use-of-Force Incidents*

Upon completion of the investigations into the Byoune and Wicks shootings, Chief Seabrooks concluded that Ragan's actions were in accordance with the IPD policy regarding use of deadly force. She acknowledged, however, that the community

4

criticized the IPD based upon its "history of shooting black citizens, irrespective of the race of the officer . . . ."

With respect to the Melendez incident, the investigator recommended that Ragan receive a 12-day suspension. After meeting with Ragan and his attorney, Chief Seabrooks decided to impose the recommended 12-day suspension.

5. *Events Leading to Termination*

In May 2009, Ragan was temporarily assigned to the IPD government liaison section. The IPD was undergoing a Department of Justice investigation, and the IPD had to provide information and responsive documents. While assigned to this section, Ragan was the subject of two internal affairs investigations arising from internal complaints.

a. *Complaint Leading to Charge of Conduct Unbecoming of an Officer*

A civilian employee reported that Ragan allegedly was playing with paper airplanes while on duty. Ragan confronted the civilian employee in the parking lot, apologized, and asked her to "bring it to my attention," the next time. Ragan was in full uniform and carrying his gun when he approached the civilian employee. After this face-to-face confrontation, the civilian employee complained. As a result, an internal affairs investigation was conducted. The investigator recommended a three-day suspension, but Chief Seabrooks reduced the suspension to one day.

b. *Unauthorized Copying of Documents Related to the Carranza Incident*

While working in the IPD government liaison section, Ragan came across documents relating to the Carranza incident in 2006 that he had not previously seen. Ragan copied the documents and gave them to his attorney.

An internal affairs investigation was conducted. The investigating officer recommended a 10-day suspension.

6. *Termination and DFEH Complaints*

Ragan was terminated in August 2010. Chief Seabrooks's decision was based upon Ragan's internal affairs history sheet.

Following his termination, Ragan filed a complaint with the Department of Fair Employment and Housing (DFEH) against the City. The DFEH complaint alleged that

he had been retaliated against for engaging in a protected activity and because he is the son of an IPD officer who had complained of race discrimination.

Ragan had filed two other DFEH complaints against the City in July 2009 and in November 2009. Ragan received right-to-sue letters and filed this action.

PROCEDURAL BACKGROUND

1. *Second Amended Complaint*

Ragan filed a reverse discrimination lawsuit against the City. The second amended complaint (complaint) alleges causes of action for race discrimination and two causes of action for retaliation in violation of the FEHA. Ragan alleges that he was "unlawfully suspended" from "July 2008 through April 2009," "for being involved in two shootings of African-American males." He further alleges his nine-month administrative leave was a result of a discrimination claim his father filed against the City. Ragan allegedly was denied overtime, denied working patrol, denied his ability to be promoted, and deprived of his gun and badge in July 2009 on a "trumped up" internal affairs investigation. It is alleged that Chief Seabrooks's employment decisions were based on Ragan's race.

Ragan further alleges the City retaliated against him after he filed the DFEH complaints in July 2009 and November 2009. Ragan also alleges retaliation arising from his association with his father who sued the IPD for reverse discrimination in 2005.[3]

2. *The City's Motion for Summary Judgment, and Ragan's Appeal*

The City filed a motion for summary judgment, asking the trial court to adjudicate 58 issues. Among the issues raised, the City argued that Ragan could not establish a prima facie case of race discrimination because he could not show Chief Seabrooks had any discriminatory animus toward Caucasians. The City also argued that Ragan's retaliation claims failed because he could not establish a prima facie case, and California law does not recognize associational retaliation under the FEHA.

---

[3]     Although not alleged as a separate cause of action, Ragan alleges the City failed to take reasonable steps to prevent discrimination (§ 12940, subd. (k)).

In support of its motion, the City submitted a separate statement of facts, listing 219 undisputed material facts. In response, Ragan submitted an additional 125 undisputed material facts. To dispute many of the City's facts, Ragan cited to all 125 of his additional undisputed material facts.[4]

The trial court limited the issues, granted summary judgment on the grounds that the City met its burden to show Ragan could not establish a prima facie case of discrimination or retaliation. The trial court also concluded there is no cause of action for associational retaliation under the FEHA. The trial court entered judgment against Ragan, and he timely filed this appeal.

DISCUSSION

1. *Standard of Review*

We independently review the ruling on a summary judgment motion. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*)). To prevail on a motion for summary judgment in an action brought under the FEHA, a defendant employer initially has the burden to show "either that [the] (1) plaintiff could not establish one of the elements of the FEHA claim, or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment. [Citations]."[5] (*Avila v. Continental*

---

[4]    One example is illustrative. The City's Fact No. 86 states: "Plaintiff's temporary assignment to an administrative position in the Government Liaison Section had no impact on his ability to promote within the IPD." Ragan disputes this fact, citing to all 125 of his additional undisputed material facts. If this fact were actually disputed, we would presume Ragan would submit evidence related to the IPD promotion policy or other evidence that he had been denied a promotion. Not so. Upon our review of these 125 additional undisputed material facts, not one relates to promotions while Ragan was assigned to his administrative position. We can only speculate what, if any significance, Ragan's 2004-2005 performance evaluation, cited as additional undisputed facts 228-235, would have on his ability to be promoted in 2009 if he did not actually attempt to seek a promotion.

[5]    California has adopted the *McDonnell-Douglas* test, which places on the plaintiff the initial burden to establish a prima facie case of discrimination. (*Guz*, *supra*, 24 Cal.4th at p. 354.) "While the plaintiff's prima facie burden is 'not onerous' [citation], he must at least show ' "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based

7

*Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1247; Code Civ. Proc., § 437c, subd. (p)(2).) If the employer meets this burden, the employer is entitled to summary judgment unless the plaintiff produces admissible evidence that raises a triable issue of fact material to the employer's showing. (*Guz, supra*, 24 Cal.4th at p. 357; *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1005.) In determining whether these burdens have been met, we view the evidence in the light most favorable to Ragan, as the nonmoving party, liberally construing his evidence while strictly scrutinizing the City's evidence. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) We will affirm a summary judgment or summary adjudication if it is correct on any ground that the parties had an adequate opportunity to address in the trial court. (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22.)

As noted, our review is made more difficult because of Ragan's defective separate statement submitted to oppose the summary judgment motion. "Separate statements are required not to satisfy a sadistic urge to torment lawyers, but rather to afford due process to opposing parties and to permit trial courts to expeditiously review complex motions for [summary adjudication] and summary judgment to determine quickly and efficiently whether material facts are disputed." (*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 335.) "The separate statement 'provides a convenient and expeditious vehicle permitting the trial court to hone in on the truly disputed facts.' [Citation.]" (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 252.)

Ragan did not draft his responsive separate statement with these concepts in mind, that is, to permit the court to hone in on any truly disputed fact. In our review of the separate statements, many of the so-called disputed facts are not actually disputed, and as to those facts that are disputed, Ragan did not state the nature of the dispute and did not

---

on a [prohibited] discriminatory criterion . . . .' [Citation]." [Citation.]' " (*Id.* at p. 355.) If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises. At this trial stage, the burden shifts to the employer to rebut the presumption by producing admissible evidence that its action was taken for a legitimate, nondiscriminatory reason. (*Id.* at pp. 355-356.)

8

describe or cite to the evidence that supports his position. (Cal. Rules of Court, rule 3.1350(f); see *Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1209-1210.) Instead, Ragan cited to his additional 125 undisputed facts and left it to the court to evaluate all of the evidence to support his position that a specific material fact was disputed.

Ragan, however, has honed in on the disputed facts in his briefing on appeal. His position is clear, and he cites to evidence that he claims raises a triable issue of fact. We review this evidence to determine whether Ragan has met his burden to defeat the City's showing in its motion for summary judgment.

## 2. *Ragan Cannot Establish an Element of his Prima Facie Case of Race Discrimination (First Cause of Action)*

A prima facie case of race discrimination generally means the plaintiff must provide evidence that (1) the plaintiff was a member of a protected class,[6] (2) the plaintiff was qualified for the position he or she sought or was performing competently in the position held, (3) the plaintiff suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive. (*Guz, supra*, 24 Cal.4th at p. 355.) Our focus here is on the fourth element, that is, whether there is admissible evidence to raise a triable issue of fact suggesting Chief Seabrooks harbored a discriminatory animus toward Caucasians.

### a. *Community Sentiment Against Ragan and the IPD*

Ragan contends there is a triable issue of fact because Chief Seabrooks's decision to place him on paid administrative leave was motivated by the anti-Caucasian sentiment

---

[6] Because the first element of the *McDonnell-Douglas* burden-shifting framework requires that the plaintiff show he or she is a member of a protected class, some courts in reverse discrimination cases brought by Caucasian plaintiffs require a Caucasian/male plaintiff to show background circumstances sufficient to demonstrate that the particular employer discriminates against Caucasians. (*Hague v. Thompson Distribution Co.* (7th Cir. 2006) 436 F.3d 816, 820-822; see also Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2012) ¶¶ 7.233 to 7.235, p. 7-42 (rev. #1, 2008).)

in the community following the Wicks shooting. Ragan cites the following evidence to raise a triable issue of fact: (1) Ragan is Caucasian and Chief Seabrooks is African-American; (2) Ragan's use-of-force incidents in 2008 involved two African-American males and the third use-of-force incident occurred in the Hispanic community; (3) Ragan was identified as the shooter of the two African-American males; (4) 100 people attended a city council meeting, and those attending spoke about Ragan's race and criticized the IPD's treatment of people of color; (5) Chief Seabrooks attended community meetings after the shootings; and (6) Chief Seabrooks admitted Ragan's administrative leave was motivated by community concerns.

As to the first three pieces of evidence, race alone is not enough. The *McDonnell-Douglas* test requires "some other circumstance," suggesting a discriminatory motive. (*Guz, supra*, 24 Cal.4th at p. 355.)

Ragan's fourth piece of evidence is Chief Seabrooks's deposition testimony describing the city council meeting. Chief Seabrooks testified: "In the aftermath of the Wicks incident, in an open session of the city council wherein I was present and roughly 100 people spoke for three minutes each, there was a lot of conversation and accusations about racial bias within the police department as it relates to the officer's race, the fact that he had been involved in the incidents in the community, actually. [¶] It wasn't just about the Wicks shooting. It was about all – the two shootings coupled with the circumstance involving Mr. Melendez and some other things that had just been out in the environment. Race became an issue." Chief Seabrooks continued: "Inglewood police officers had seemingly had a history of shooting black citizens, irrespective of the race of the officer . . . . The fact that Inglewood officers seemingly shot unarmed people with a degree of frequency was the issue. [¶] The fact that Inglewood police officers seemingly were inappropriate and overreacted with people of color was an issue. The fact that we killed an innocent man and shot another person was an issue."

This evidence suggests that the citizens were concerned about the accountability of the IPD and its officers toward people of color. It does not create a reasonable inference of any racial animosity on the part of Chief Seabrooks toward Caucasian police

10

officers under her command. Ragan's statement in his brief that the community demanded retribution during the city council meeting is not supported by any cited evidence. It is undisputed that upon completion of the investigations into the two fatal shootings, Chief Seabrooks took no retribution, concluding Ragan followed IPD policy.

For the same reasons, Chief Seabrooks's attendance at a community meeting (the fifth piece of evidence) also does not raise a reasonable inference that she harbored a discriminatory animus toward Ragan because of his race.

Finally, Ragan describes his last and "most important" piece of evidence as an admission by Chief Seabrooks that she was motivated by anti-Caucasian community animosity toward him. The deposition testimony Ragan cites does not support this assertion. Chief Seabrooks testified regarding her decision to place Ragan on paid administrative leave: "My concerns were that the employee might need additional cooling off time. It's a very busy city. Things happen. And I wanted to be sure that when all of these matters were resolved, that the employee could be focused on the work. [¶] Equally, that the community could have some cooling off time because my job is to ensure that we don't have a level of unrest that comes, because people are passionate about their viewpoints." Chief Seabrooks acknowledged the public outcry and potential for civil disobedience because of the fatal shootings – no reasonable inference can be drawn from this testimony that accountability as an IPD officer and the safety of an IPD officer during this difficult period was motivated by Chief Seabrooks's discriminatory animus toward Caucasian officers.

Ragan cites no other evidence to establish a discriminatory motive for Chief Seabrooks's other employment decisions, that is, his assignment to the IPD government liaison section and his termination. Nor could he. It is undisputed that the psychologist, not Chief Seabrooks, determined Ragan was temporarily not fit to return to patrol duty. Upon completion of the internal affairs investigations into the three use-of-force incidents, it is undisputed that Chief Seabrooks took no adverse action with respect to the two fatal shootings. While Chief Seabrooks imposed the recommended 12-day suspension following an investigation into the Melendez incident, Ragan does not

contend that the investigators who recommended the discipline harbored anti-Caucasian animosity. Ragan's termination occurred in August 2010, more than two years after the three use-of-force incidents. There is no reasonable inference to be drawn from this evidence that any of Chief Seabrooks's employment decisions were motivated by a discriminatory animus toward Ragan because of his race.

Relying on federal cases, Ragan contends that his reverse discrimination claim survives summary judgment if he can show evidence that there was some community pressure by the minority community on Chief Seabrooks to place him on a lengthy administrative leave (or to take other adverse employment actions). Of the four cited cases, only *Franko v. City of Cleveland* (N.D.Ohio 2009) 654 F.Supp.2d 711 (*Franko*), reversed summary judgment in favor of the employer.[7] *Franko* is distinguishable.

In *Franko*, the plaintiff was a male Caucasian police officer who was placed on restricted duty for eight months after an incident involving the fatal shooting of an African-American male. (*Franko*, *supra*, 654 F.Supp.2d at p. 714.) To establish that the

---

[7]    In *Hague v. Thompson Distribution Co.*, *supra*, 436 F.3d 816, the Seventh Circuit discussed background circumstances sufficient to give rise to an inference that the defendant is one of those unusual employers who discriminates against the majority. The background circumstances existed when five plaintiffs, the only Caucasians at a company, presented evidence that their African-American boss fired them and replaced three of them with African-American employees, the fourth plaintiff's job was assumed by an African-American employee, and the fifth was not replaced. (*Id*. at p. 822.) In this context, the Seventh Circuit suggested these background circumstances were sufficient to satisfy the plaintiff's burden to establish the first element of the *McDonnell-Douglas* framework in reverse discrimination cases. Although not present in *Hague*, in cases involving a Caucasian decisionmaker favoring minorities, the court also noted a plaintiff might be able to use evidence of public opinion or affirmative action to show a Caucasian decisionmaker might favor minorities. (*Id*. at p. 822, fn. 5.) In *Preston v. Wisconsin Health Fund* (7th Cir. 2005) 397 F.3d 539, the Seventh Circuit stated that an affirmative action plan or public opinion coupled with other facts or evidence indicating an employer is inclined to discriminate against non-minorities, might give rise to an inference of discrimination. (*Id*. at p. 542; see also *Jones v. City of Springfield, Ill.* (C.D.Ill. 2008) 540 F.Supp.2d 1023, 1033, 1034-1036 [evidence of public pressure to promote African-Americans was sufficient to show background circumstances to establish a prima facie case, but city had legitimate non-discriminatory reason for its decision].)

City of Cleveland discriminated against the majority, the plaintiff presented evidence that his restricted duty violated the 45-day policy, the Caucasian mayor of Cleveland left him a voice mail while Franko was on restricted duty stating he was in the "eye of the storm at the time,"[8] and in a federal district court case, the jury returned a verdict finding the City of Cleveland intentionally discriminated against a Caucasian police officer. (*Id.* at p. 718.) This evidence established a prima facie case. (*Ibid.*)

Unlike *Franko*, even with all inferences drawn in his favor, Ragan cannot raise a triable issue of fact to defeat the City's showing of the absence of a discriminatory motive. Chief Seabrooks acknowledged in her deposition that the community was highly critical of the IPD. The community criticism was directed at Ragan because of his conduct and because of the race of the shooter and the victims. The City was in "the eye of the storm" based on the IPD's accountability, and Ragan's use-of-force incidents. Despite Ragan's argument to the contrary, there is no evidence the community or City officials insisted that Chief Seabrooks take a course of action against Ragan, as suggested in Ragan's hypothetical, or Chief Seabrooks was overly sensitive to the public outcry as the Cleveland mayor appeared to be in *Franko*, or there was a history of reverse discrimination in the IPD. The test employed by the *Franko* court requires more than just public opinion and the race of the plaintiff – there must be other facts, not present here, to show an employer discriminates against the majority.

b. *Disparate Treatment of a Similarly Situated African-American Officer*

Ragan argues community sentiment, coupled with his evidence that Chief Seabrooks treated a similarly situated African-American officer differently raised a triable issue of fact to establish discriminatory motive. Although disparate treatment often is raised to show pretext, *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008)

---

[8] Franko testified regarding the voice mail he received: "Mayor Campbell called, she said she was calling to see how I was doing. She said that I was in the eye of the storm at the time. It was more about the elections than about me right now, seeing that my shooting was a couple days before the primaries." (*Franko*, *supra*, 654 F.Supp.2d at p. 718.)

166 Cal.App.4th 952, 991, appears to include disparate treatment as an element of a prima facie case of discrimination.

"Another employee is similarly situated if, among other things, he or she ' "engaged in the same conduct without any mitigating or distinguishing circumstances." ' [Citation.]" (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 172.) To raise a triable issue, Ragan must identify other similarly situated police officers.

Ragan cites to the treatment of an African-American officer who "had been involved in three officer involved shootings," one in 2008, and "he had two other shootings probably from the years previous, say from like 2006, 2007. I know there's [*sic*] about three shootings." Ragan testified that this officer was placed on leave for about a month. Ragan was not similarly situated. He was involved in a fatal shooting, returned to work, and two months later was involved in another fatal shooting. He was placed on administrative leave until the internal affairs investigations were completed.

In sum, Ragan has not presented any evidence other than his race upon which a reasonable inference can be drawn that the length of his paid administrative leave (or any other employment decision) was based upon Chief Seabrooks's discriminatory animus toward Caucasian officers. Accordingly, Ragan failed to produce admissible evidence to raise a triable issue of fact material to the City's showing that Ragan cannot establish the fourth element of a prima facie case of race discrimination.

3. *Ragan's Retaliation Claims Fail as a Matter of Law*

To maintain a claim for retaliation under the FEHA, a plaintiff must show (1) he engaged in a " 'protected activity;' " (2) he experienced an "adverse employment action;" and (3) there is a causal link between the protected activity and the employer's action. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042; *Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 814.) " 'Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.' [Citations.]" (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 70.) " ' "The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected

14

activities and the proximity in time between the protected action and allegedly retaliatory employment decision.' " [Citation.]' " (*Id.* at p. 69.)

The City presented evidence that Ragan cannot establish the third element of a prima facie case of retaliation. Ragan has not presented evidence to raise a triable issue of material fact to defeat the City's showing.

a. *No Causal Link Exists Between Filing DFEH Complaints and an Adverse Employment Action (Second Cause of Action)*

Ragan contends that he presented evidence of a causal link between his filing of the DFEH complaints against the City and Chief Seabrooks's decision to terminate him. Although Chief Seabrooks testified at her deposition that she did not see either the July 2009 or November 2009 DFEH complaints, Ragan cites to evidence from which he claims a reasonable inference can be drawn to dispute this fact. We disagree.

Ragan cites to evidence that on at least two occasions, other officers brought discrimination charges against Chief Seabrooks, and she was aware that these officers had filed DFEH complaints. These DFEH complaints, however, named Chief Seabrooks. Ragan's DFEH complaints named the City.

Although Ragan did not name Chief Seabrooks in his DFEH complaints, he presented evidence that the chief of police is notified of lawsuits filed against the City. The DFEH complaint is not a lawsuit. Ragan also paraphrases Chief Seabrooks's deposition testimony, by stating "if the clerk's office recognizes that a document contains an employment discrimination claim, it would be routed to her." Chief Seabrooks testified: "If the employee files the documents and if someone in the clerk's office recognizes that I should receive a document, I may get it. Depending on if it's – if it reaches the city attorney's level, I may get it. But there is not a consistent way . . . ." This evidence, viewed in the light most favorable to Ragan, does not raise a triable issue of fact that Chief Seabrooks routinely receives DFEH complaints against the City, from which an inference could be drawn that Chief Seabrooks had knowledge of Ragan's DFEH complaints against the City. Without such knowledge, Chief Seabrooks could not

15

have made the decision to terminate Ragan based upon this alleged protected activity.[9] (*Morgan v. Regents of University of California*, *supra*, 88 Cal.App.4th at p. 70.)

### b. *No Causal Link Exists Between Ragan's Father's Lawsuit and an Adverse Employment Action (Third Cause of Action)*

Ragan contends the FEHA recognizes associational retaliation, which he has alleged based upon his relationship with his father who sued the City in 2005 for reverse discrimination. The City contends no such cause of action exists under the FEHA. We need not resolve this issue because, even if we assume Ragan engaged in protected activity, there is no causal link between Ragan's father's lawsuit and any adverse employment action. Ragan's father filed a reverse discrimination lawsuit against the City two years before Chief Seabrooks became chief of police. Chief Seabrooks learned about Ragan's father's lawsuit in the summer of 2008, but she did not terminate Ragan until August 2010. Given the temporal gap between knowledge of Ragan's father's lawsuit and the decision to terminate Ragan, no reasonable inference can be drawn to defeat the City's showing. Accordingly, Ragan cannot establish the third element of a prima facie case of retaliation. (See *Morgan v. Regents of University of California*, *supra*, 88 Cal.App.4th at p. 69.)

### c. *Additional Bases to Support Retaliation Claim Not Alleged*

Ragan asserts two other protected activities that purportedly support his retaliation claim under the FEHA that were not alleged in the complaint, including a meeting with Chief Seabrooks to discuss the recommended discipline following the investigation into the Melendez incident, and his removal of IPD documents related to the Carranza incident. We reject this argument on procedural grounds.

---

[9]    Causation sufficient to establish the third element of a prima facie case may be inferred from the proximity in time between the protected activity and the allegedly retaliatory employment decision. In this case, no inference can be drawn because there is an eight-month temporal gap between the filing of the November 29 DFEH complaint and Chief Seabrooks's decision to terminate Ragan.

16

A summary judgment motion is directed to the issues framed by the pleadings. Those are the only issues a motion for summary judgment must address. (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1249-1250.) The complaint does not allege these additional grounds for the retaliation claim. Thus, we do not address these issues.

4. *Failure to Maintain Environment Free From Race Discrimination*

The complaint alleges failure to provide an environment free from discrimination in violation of the FEHA (§ 12940, subd. (k)). An actionable claim under section 12940, subdivision (k) is dependent on a claim of actual discrimination. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289.)

Because we affirm summary judgment on all of the FEHA causes of action, we also affirm as to this cause of action.

DISPOSITION

The judgment is affirmed. The City of Inglewood is awarded costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.

We concur:


CROSKEY, Acting P. J.


KITCHING, J.

17